Filed 12/28/21  In re T.E. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re T.E. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>B.R.,<br><br>       Defendant and Appellant. | A162161<br><br>(Marin County Super. Ct. Nos. JV26885A & JV26886A) |

B.R., the mother of five-year-old T.E. and her now four-year-old brother Timothy E., appeals from orders terminating her parental rights.  She contends the juvenile court relied upon an improper standard in determining she failed to demonstrate the applicability of the beneficial relationship exception to adoption as the permanent plan (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1]  Specifically, she argues that under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which was decided a few months after the hearing in this case, the trial court erred in rejecting application of the exception

---

[1] All undisgnated statutory references are to the Welfare and Institutions Code.

1

because it found mother did not occupy a "parental role" in the children's lives.  We affirm.

## BACKGROUND

The children were removed from parental custody in November 2019, when mother was arrested after running into traffic on a six-lane freeway with 22-month-old Timothy in a chest carrier and 36-month-old T.E. in her arms.  Both children were hospitalized for severe malnutrition.  Timothy, at 12 pounds, was in the negative sixth percentile for weight for his age, and required a peripherally inserted central catheter (PICC line) to supply nutrients as a life-saving measure; he also had severe eczema and black dots all over his body.  T.E. was in the 27.76th percentile for weight.  Doctors determined the children's malnutrition was a "direct result of neglect and malnutrition/dehydration, and could not have been caused by genetics or trauma."

When interviewed, father reported that mother had left their home with the children a week before; over the past four months, she had frequently left with the children for up to a week at a time, without telling father where they were.[2]  Father expressed concern that mother might be using drugs, because she had recently lost a lot of weight and had been acting erratically, and also that she could be suffering from mental illness.  Father reported that mother only fed Timothy breast milk because she believed he was allergic to everything, although allergy test results showed he was

_____

[2] The parents reported that they had lived together for several years, father is the biological father of both children, and he had provided for them throughout their lives.  Mother has a teenage daughter who has been raised by her grandmother since birth.  Father has two adult children and a son approximately 11 years old who is being raised by his mother.

allergic only to tree nuts; father was aware Timothy was underweight and should be eating solid food.

When the social worker interviewed mother, she reported believing someone had drugged her prior to the incident leading to her arrest, as well as that she was being drugged in jail; she denied voluntarily using drugs or having mental health issues. Mother knew Timothy was underweight and stated that he was only breastfeeding because "he is allergic to everything and gets a rash when he eats food." Mother believed T.E. was a healthy weight. She reported that T.E. had been hospitalized for malnutrition for a week in 2017, at which time mother was counseled on how to increase and manage T.E.'s weight. Mother had been counseled on both children's malnutrition at their doctors' appointments, but did not like the advice she was given.

During the interview, mother pulled her sweatshirt over her mouth and said her eyes were burning, her lips were dry, and her body felt numb. She was able to maintain a conversation throughout the interview, but experienced "extreme paranoia," fidgeted throughout, and insisted on "the reality of her thoughts and fears (specifically, around being poisoned and around her children being allergic to foods)." She appeared to understand the severity of the situation, but was unable to problem solve or suggest what she could have done differently to ensure her children's health and safety.

The Marin County Department of Health and Human Services (Department) filed petitions alleging both children were at serious risk of suffering serious physical harm or illness due to the mother's failure to provide adequate food and medical treatment, mother's inability to provide proper care and control due to substance abuse or mental illness, and father's

3

failure to protect the children.  The children were detained and medical decision-making rights transferred to the Department.

As of December 2019, according to the Department's jurisdiction report, Timothy had been transferred to Oakland Children's Hospital's acute rehabilitation unit, where he was expected to remain until after the new year.  He was receiving food primarily through a feeding tube, was alert and engaged, and could support himself in a sitting position, but he was not crawling or walking.  T.E. was living in a resource home, where she appeared to be comfortable.  In an interview on November 22, 2019, mother did not display symptoms of paranoia and denied having run into traffic with the children or being concerned about being poisoned.  Over the next days, however, she left messages for the social worker indicating a "heightened state of crisis," including that she had gone to the hospital and had been diagnosed with schizophrenia.  On December 2, she was placed on a 14-day psychiatric hold.  The court continued the jurisdiction hearing and set a combined jurisdiction and disposition hearing for January 7, 2020.

The Department's January 2, 2020, reports stated that Timothy was expected to remain hospitalized for several more weeks.  The resource parents to whom he had been assigned visited regularly and received training regarding his medical needs.  T.E. had been placed with a new resource family and appeared to be comfortable.  The children's resource families were in contact and T.E.'s family was bringing her to visit her brother.  Mother had been charged with several offenses arising from the November 6, 2019 incident (willful cruelty to a child, inflicting injury upon a child, battery on a peace officer, vandalism, and obstructing/resisting an officer), and the court had issued a three-year protective order for the children, with an exception for peaceful contact orders made by a family, juvenile or probate court.  The

4

primary concern was the parents' failure or inability to provide the children with adequate nutrition or medical care, and the Department expressed concern with mother's mental health and both parents' failure to grasp the severity of the children's health status at the time of removal. The Department noted that both parents denied substance abuse, both had completed high school and some college, and father had maintained steady employment for many years.

Due to the Department's inability to assess mother's mental health status for the first weeks after detention, and her subsequent 14-day psychiatric hospitalization, her first visit with T.E. did not occur until December 26, 2019, with father also present.[3] T.E. was initially timid and wary of mother, but mother "did well following [T.E.'s] lead and giving her space" and by the end of the visit mother "was able to embrace [T.E.] and they played together." The Department recommended continuation of therapeutic visits for mother to allow for observation by mental health practitioners and therapeutic intervention and support as needed, and recommended that mother not be permitted to visit Timothy while he remained in the hospital because adequate supervision could not be provided there.

The Department noted that it was clear from the severity of the circumstances leading to the Department's involvement, mother's initial paranoid statements, and her subsequent hospitalization that mother's previously untreated mental illness impeded her ability to care for the

---

[3] Father had been attending supervised visits with T.E. consistently, always coming prepared with food and engaging with T.E. throughout the visit; they were observed to have a "close, loving relationship." Father visited Timothy at the hospital almost every day, there had been no reports of concern, and the regular contact appeared to be beneficial for Timothy.

5

children, and that mother's compliance with taking her prescribed medication and willingness to accept treatment were positive signs. The Department remained highly concerned, however, that more time was needed for mother to demonstrate she would be able to manage her symptoms, and that mother continued to minimize the harm to the children and describe Timothy's development prior to detention as normal. T.E. was reported to be thriving in her resource home and gaining weight; Timothy was medically stable and, with the support of daily therapy, improving in his speech, feeding, and motor skills; but both children required ongoing attention to medical and developmental needs.

At the January 7, 2020 hearing, the parents submitted to jurisdiction and out of home placement. The court ordered supervised visitation once a week for up to one and a half hours for both parents.

Timothy was discharged from the hospital in January 2020, and moved to his resource family's home, then subsequently moved to another resource family in May 2020. The Department's July 2020 status review report stated that Timothy continued to receive most of his nutrition through a gastrostomy tube, which he was expected to need for at least two more years. In addition to severe eczema, he had a rare and serious hereditary skin disorder that placed him at high risk of developing skin cancer, making avoidance of sun exposure crucial. Timothy also needed follow-up for a failed vision screening and allergy testing. COVID-19 shelter in place orders had delayed some of the necessary testing and assessment. Timothy was receiving regional center services for developmental delays, including speech, feeding, occupational and physical therapy, and had made significant progress in all areas other than feeding.

As of the July 2020 report, T.E. was no longer malnourished and had been diagnosed with a number of food allergies, several severe. She showed delayed speech and fine motor skills for which she was awaiting further assessment, as well as developmental concerns including periods of " 'freezing' in panic," waking up screaming, difficulty with potty training, and issues with memory and development of social skills. Problems related to food included difficulty identifying when she feels hungry or full (for example, eating to the point of throwing up) and crying when she saw her resource parents eating. T.E. had recently started pulling out her hair if there was anything in it (e.g., barrette) and/or on the day following a visit with her parents, and until late May 2020, she would wake up screaming and crying on the mornings after visits. She often cried during Zoom visits with her parents, which had replaced in-person visits due to shelter in place orders, and had trouble transitioning out of visits, both in person and on Zoom.

During the six-month period following the January 7, 2020 hearing, mother reportedly showed commitment to the case plan goals and regularly attended classes, appointments, and visits, but was unable to demonstrate increased awareness or knowledge of the children's needs. Mother was taking her psychotropic medication, but, according to a psychological evaluation conducted in April 2020, by mother's therapist and another clinician, mother had little insight into her mental illness and how it impacted her functioning and parenting or how to manage her symptoms going forward.

Both parents had "perfect attendance" at visits with each of the children and had transitioned smoothly from in-person visits to video conferencing, and the parents participated in all of Timothy's wraparound meetings. The Department expressed concern, however, about the parents'

7

ability to provide developmentally and medically appropriate amounts and types of food at visits, which required multiple interventions by staff.

The Department recommended terminating reunification services because, despite the parents' engagement in services, obvious love for the children and desire to have the children return home, the parents' "best efforts" were "not enough to meet the vastness of the children's needs and to keep the children safe from future harm." The parents requested a contested hearing, which was conducted in September 2020.

The Department's addendum report related that at mother's first visit with T.E. after the July hearing, she remained seated for the whole visit and engaged with T.E. only on the infrequent occasions when T.E. came over to her. At a second visit, mother was more animated. But at both visits, T.E. appeared "guarded" around mother, checking in with the social worker through eye contact when she approached mother, and several times when mother asked T.E. to come to her, T.E. ignored mother or said "no" or "no thanks." Since the end of June, mother had stopped engaging in wraparound services; her clinician had spoken with mother only once and mother had not returned the social worker's call to discuss the situation.

After the September hearing, the juvenile court terminated reunification services and set a section 366.26 hearing. Both parents filed writ petitions challenging the court's decision, which were denied by this court in an unpublished opinion. (*B.R. v. Superior Court* (Jan. 22, 2021, A161022).)

The Department's report for the section 366.26 hearing, filed on December 29, 2020, recommended termination of parental rights and a permanent plan of adoption. Both children were reported to be "making major strides and thriving" in their respective resource homes. Each of the

8

families wanted to adopt the child placed with them, and both were committed to keeping the siblings "connected" throughout their lives and excited about gathering as an "extended family." Timothy reportedly "demonstrates a comfortability and familiarity toward" his resource mother and "calls her 'mommy' and tell[s] her he loves her." T.E. "appears happy and well-adjusted" in her resource family home, and "loves her room and resource family siblings."

Timothy's feeding issues continued, but he no longer needed speech, occupational, or physical therapy. T.E.'s potty training had improved, she demonstrated solid gross motor skills, and she was reported to have healthy peer relationships. She was being assessed for sensory processing, speech, fine motor skills, social skills, emotional disturbance, and autism. T.E. had been seeing a therapist weekly by video chat since September, and there were concerns about her dissociative freeze response to stress, sensory sensitivity, and echolalia. According to the therapist, the freezing was a dissociative response to trauma, the only known treatment for which was developing a stable permanent relationship with at least one adult who could consistently meet the child's needs. The therapist viewed the need for a consistent adult relationship as "crucial" for T.E., and said "the best thing the Department can do for [T.E.] is keep [her] in the same placement, so as not to interrupt her attachment with her current caregivers."

The Department had attempted to find a home for the children to be placed together, but had been unsuccessful due to the degree of their needs. Each of the children's respective resource parents had initially been open to placement of the other sibling, then declined because of Timothy's high needs; subsequently, both families gained confidence and became willing to accept placement of the other sibling. But due to the children's mental health

9

vulnerability and T.E.'s therapist's assessment, it was concluded that moving either child from his or her current placement would be detrimental.

The Department reported that from November 12, 2019, to June 24, 2020, the parents attended 36 of 37 scheduled visits with Timothy, in person and then by video chat; the only exception was a visit cancelled due to the pandemic. The court ordered one in-person visit in November 2020, at which Timothy was shy and curious at first, then played with the parents, enjoyed watching cartoon videos on the parents' phone and, when it was time to leave, readily received hugs from the parents. When the parents walked away, Timothy started to run toward them, but came back when his resource mother called him once. The parents had attended 27 of 28 scheduled visits with T.E., one having been cancelled because T.E. was sick. After July 7, 2020, when the court ordered visitation for a total of two hours per month, the parents attended all their visits with T.E. and missed one visit with Timothy. The Department reported that "[o]verall, the visits went well": The parents were responsive to directives from staff about regulating the amount of food offered during the visits; they played and read to the children, consistently brought toys and snacks, and father wiped down the toys before giving them to T.E.'s resource parents to take home.

The Department filed an addendum report on February 17, 2021. The parents' newborn had been removed from their care on February 2, 2021, at three weeks of age, due to concern that the parents had not resolved the safety issues concerning T.E. and Timothy. Mother had stopped taking her medication in April, against her doctor's recommendation, when she discovered she was pregnant. The Department stated T.E. and Timothy were likely to be adopted, as both were in homes with committed caregivers and no known impediments to adoption. Each of the families had expressed

10

openness to adopting the other sibling in the unlikely event the other's placement was disrupted, and Timothy's resource parent had expressed wanting to be considered as a concurrent home for newborn. The report described each child's daily routine and "bonding moments" between each child and the respective resource parents.

The parents continued to visit with Timothy by video chat due to his medical fragility and concerns about COVID-19, twice a month for one hour. Of the 13 listed visits since September 7, 2020, mother had been present for the full duration of all but two, one in which she and father were both "in and out" and one just after mother gave birth. The visits "go well and recently [mother] has been reading to Timothy which [he] enjoys." Visits with T.E. were in person, except for one video visit at the parents' request; mother missed one due to a doctor's appointment for the newborn and one could not be held because of a sick family member in the resource family home. These visits "go well and the parents are appropriate and loving with" T.E. T.E. and Timothy continued to have weekly video visits.

In recommending adoption as offering the stability that was in the children's best interests, the Department's report stated that although the parents demonstrate love for the children, the children "never consistently thrived in their care" and the parents have not cared for the children since November 6, 2019. In the Department's view, "[t]he relationship that [mother and father] have with Timothy and [T.E.] is friendly but not parental in nature," "is not strong enough that Timothy and [T.E.] would benefit from continuing the relationship to such a degree that terminating the parental rights of [mother and father] would be detrimental to them" and "does not promote their well-being to such a degree as to outweigh the well-being they would gain in adoptive homes."

11

At the contested section 366.26 hearing on February 23, 2021, mother testified that she and father brought toys to visits with T.E., played games like "duck, duck, goose," did "ABC's" and counting, and sometimes read to her. "We pretty much played, learned, and just whatever she wanted to do. Sometimes she would run us, so it was just be entertained by her." When visits were at the park, they played on the slide, walked, ran, and exercised. Mother testified, "It was hard for us to say goodbye. In the beginning like she wanted to go with us and like it was really hard, so then they were— she knew that we were leaving we would tell her we have five more minutes and she would be okay, it's time to go." On Zoom visits, "she would have a toy and we would talk about the toy, or we would show her like different things on the TV, and she remembered the cartoon, like ABC's or different cartoons that she would go through. And then ask questions like what's the color that you have, describe the color of toy she has, or her cup, or we'll just ask her what color is she wearing, or how was her day going?"

As earlier indicated, visits with Timothy were almost all by video chat. Mother testified that she would read to Timothy and he would repeat words and sounds, then go off and play, then come back and ask her to read another book. Sometimes he would come to the phone and say " 'I love you, mom,' and just express his feelings sometimes. Are you happy? And like, yes, we're happy." At the in-person visit in November, after not seeing Timothy in person since around March, Timothy was "pretty skeptical at first because he didn't . . . know who we were, and then he came to us and everything and excited to see us and play with us, and we . . . play with him, read books to him." Mother testified, "[i]t was pretty different from Zoom and in person because he was really happy to see us." She testified that she missed her children every day and wanted to continue a relationship with them; she was

12

hoping the adoption would not go through so "we can get them back," saying "it's . . . unfair."

After hearing arguments from counsel, the court found the children were adoptable and the parents failed to establish the beneficial relationship exception to the statutory preference for adoption.[4]  The court terminated parental rights and ordered that the children remain in their current placements with a permanent plan of adoption.

This appeal followed.

## DISCUSSION

As we recently explained in *In re J.D.* (2021) 70 Cal.App.5th 833, 851–852 (*J.D.*), "[t]he sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).)  At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.'  (*In re Marilyn H.,* at p. 305.)  The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for adoption.  (*Caden C., supra*, at 11 Cal.5th at pp. 630–631.)  However, the statutes provide an exception where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).)"

"As summarized in *Caden C.*, 'the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things.  The

---

[4] The court also found the parents did not establish the sibling relationship exception, which was argued at the hearing, but is not at issue on this appeal.

13

parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.'" (*J.D., supra,* 70 Cal.App.5th at p. 852, quoting *Caden C., supra,* 11 Cal.5th at pp. 636–637.)

In the present case, it is undisputed that mother satisfied the first prong of the analysis. Mother's visitation was consistent and positive: The juvenile court found the parents had been "fantastic," having made almost every visit, whether remote or in person, and leaving no doubt they "very much love their children." The disputed question is whether mother demonstrated the children have a "substantial, positive, emotional attachment to her" such that they would benefit from continuing the relationship and terminating the relationship would be detrimental. Mother contends that in finding she did not establish the exception, the juvenile court erred by relying on factors subsequently held improper in *Caden C.* Specifically, she challenges the court's reliance on its view that mother did not occupy a "parental role" toward the children.

Explaining its ruling to the parents, the court observed that the children had been in their resource homes for a "significant amount of time," "[p]ermanency and stability [was] serving them well," T.E.'s therapist

14

"emphasizes the importance of maintaining that stability," and "the visits, and the fact that you love your children and you think that the visits have gone well, is not enough." The court cited several cases it described as holding that positive visitation was insufficient where parents had not addressed the problems that led to the dependency (*In re G.B.* (2014) 227 Cal.App.4th 1147; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, disapproved by *Caden C., supra,* 11 Cal.5th at p. 637, fn. 6; *In re K.P.* (2012) 203 Cal.App.4th 614), and noted it had already made the findings that the parents had not done so here. Describing the visits as "little more than playdates with a loving adult" and finding "no evidence that the child looked forward to visits or had difficulty separating," the court stated, "It has to be a parental relationship for the exception to apply, not merely a friendly or familiar one. . . . [T]hese visits, while lovely and wonderful, bear no resemblance to the sort of consistent, daily nurturing that marks a parental relationship, so I cannot find that the parental bond in this case outweighs the extraordinary need for stability and placement for these children, so I am finding that parental bond exception does not apply."

As we said recently in *J.D.,* "*Caden C.* did not address whether, to satisfy the second element, the nature of a parent's relationship must be 'parental,' a descriptor the Supreme Court did not use and that, standing alone, is vague and unhelpful in this context. *Caden C.* said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship' (*Caden C., supra,* 11 Cal.5th at p. 636; see also *id.* at p. 640 ['whether the relationship is such that the child would benefit from continuing it']; *id.* at p. 633 [second element addresses 'the psychological importance of the relationship for the child'].) Such a relationship is surely

15

more significant than that of a 'mere friend or playmate.' ([*In re*] *B.D.* [(2021] 66 Cal.App.5th [1218,] 1230.) But . . . the Supreme Court made clear that more than one person can occupy an important, emotional role for a child even if one—the non-reunifying parent—is incapable of providing for the child's everyday needs and well-being. Moreover, *Caden C.* also made clear that the type of relationship necessary to establish the exception is not narrowly defined or specifically identifiable, because parent-child relationships are endlessly varied. (See *id.* at p. 632.)" (*J.D., supra,* 70 Cal.App.5th at p. 865.) "[T]he beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270, citing *Caden C.,* at p. 632.)

Here, the juvenile court certainly understood that the critical assessment was the effect on the children of their relationship with mother. After finding the parents satisfied the first prong of the beneficial relationship exception, consistent visitation, the court described the "second prong" of the analysis (conflating the second and third prongs discussed in *Caden C.*) as asking, "would the child benefit from the continuing relationship to such a degree that terminating parental rights would be detrimental to the child?" Citing *In re Autumn H.* (1994) 27 Cal.App.4th 567 the court said the "big analysis" was, "Does the relationship promote the well being of the child to such a degree to outweigh the well being the child would gain in a permanent home with adoptive parents?" The court's distinction between the kind of relationship necessary for application of the exception and one that is merely "friendly or familiar" is consistent with the analysis required by *Caden C.* (*J.D., supra*, 70 Cal.App.5th at pp. 864–865 [relationship more than that of a " 'mere friend or playmate' "]), as is its

16

consideration of whether the evidence showed "the child looked forward to visits or had difficulty separating," which addressed the children's attachment to mother.

At the same time, the court's comments indicate its analysis may have been based at least in part on factors *Caden C.* subsequently disapproved. For example, the court's reference to the absence of "the sort of consistent, daily nurturing that marks a parental relationship" runs counter to *Caden C.* to the extent it suggests a parent must demonstrate an ability to provide a home or day-to-day care for the child.[5] (*Caden C., supra,* 11 Cal.5th at p. 634; *In re B.D., supra,* 66 Cal.App.5th at pp. 1229–1230.) And the court did not explain its reliance on cases in which parents were unable to overcome the problems that led to the dependency sufficiently to evaluate whether the court viewed these issues consistently with *Caden C.*'s admonition that such parental struggles are not necessarily determinative and are relevant only to the extent they inform the questions whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it[.]"[6] (*Caden C.,* at pp. 637–638.)

---

[5] Terms such as "parental relationship," "parental role," and "parental bond" may encompass both matters that do not properly bear on the analysis (like daily caretaking) and matters that *are* proper considerations (like the nurturing and security upon which a "substantial, positive, emotional attachment" are built. (*Caden C., supra,* 11 Cal.5th at p. 636.) But the analysis is complicated by the fact that these matters are not unrelated. "A 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' " (*In re B.D., supra,* 66 Cal.App.5th at p. 1230, quoting *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

[6] By the time of a section 366.26 hearing, since reunification services have been terminated and there is no question of the child returning to parental custody, "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception" and parents

Nevertheless, in the circumstances of this case, even if the juvenile court was influenced by misconceptions regarding mother's "parental role" or failure to overcome the barriers to reunification, the court could not have reached a different conclusion in balancing of the harm of losing the parental relationship against the benefits of placement in an adoptive home. (*Caden C., supra,* 11 Cal.5th at p. 640.)

As clarified in *Caden C.,* the benefit and detriment aspects of the beneficial relationship analysis are subject to different standards of review. We apply the substantial evidence standard in reviewing the juvenile court's determination whether the child's relationship with the parent is such that the child will benefit from continuing it; we review the juvenile court's decision whether termination of parental rights would be detrimental for abuse of discretion. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)

The record contains ample evidence that mother's visits with the children were positive and that mother loves them deeply, as the juvenile court recognized. Substantial evidence also supports the juvenile court's determination that the visits were not more than friendly, enjoyable encounters. Mother's testimony described pleasant sharing of activities— reading books, playing games—and made clear that the visits and her relationship with the children were critically important *to her*, but did not suggest the children felt the kind of "substantial, positive, emotional attachment" to her required under *Caden C.* There is nothing similar to the kind of evidence that led us to say, in *J.D.*, that "[w]ere it not for evidence that mother was sometimes prone to bad-mouthing C.J. and, particularly early on, threatening her and undermining her caregiving efforts, the

are not required to show substantial compliance with their case plans. (*Caden C., supra*, 11 Cal.5th at pp. 630, 637.)

18

evidence we have discussed would compel a determination that mother proved the existence of a beneficial relationship as a matter of law." (*J.D., supra,* 70 Cal.App.5th at p. 862.)

We are cognizant of the difficulty of showing the kind of relationship contemplated by the beneficial relationship exception where the Department's reports (which predate *Caden C.*) contain little information regarding the nature and quality of visits—especially, as here, in a case involving very young children and visitation hampered significantly by pandemic necessitated restrictions. Still, even if we were to find the evidence insufficient to support the juvenile court's conclusion that mother did not establish the children have "a substantial, positive, emotional attachment" to her, we would not be able to find the court abused its discretion in concluding that terminating the attachment would be detrimental to the children "even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C., supra,* 11 Cal.5th at p. 636.)

Mother presented no evidence at all that terminating the children's relationship with her "would be detrimental to the [children] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) It was mother's burden to establish these elements of the beneficial relationship exception. (*Ibid.*) Mother's argument that the juvenile court should have asked for more information about how the children felt about mother and their visits with her misunderstands this burden.[7] Contrary to mother's argument that the court should have ordered

---

[7] This is not to suggest the Department does not need to address these issues in its reports. "To assist the trial court . . . social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents taking into consideration the child's age, the portion of the child's life spent in parental

a bonding study sua sponte, mother's failure to request a bonding study forfeited the issue. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339.)[8]

Timothy was less than two years old when removed from mother's custody, T.E. almost three. Both children required hospitalization for malnutrition; Timothy's condition was dire, and for T.E. it was the second such hospitalization in her short life. At the time of the section 366.26 hearing some 15 months later, both children were living in stable placements with families who intended to adopt them, and they had made striking progress in overcoming the profound physical, emotional, and psychological difficulties they were experiencing at the outset of the dependency. Mother had visited consistently, spending time playing with, reading to and chatting with the children, and there was ample evidence she loved and felt a strong bond to the children. But there was no evidence the children felt a deep and positive connection to her, although they appeared to enjoy their visits at least much of the time. The children's need for stability and permanence was obvious, and expressly deemed crucial by T.E.'s therapist.

*Caden C.* instructs that "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the

_____

custody, the positive or negative impact of interaction with the parent, and the child's particular needs as required by *Caden C.* (*Caden C., supra*, 11 Cal.5th at pp. 632, 636.)" (*In re B.D., supra,* 66 Cal.App.5th at p. 1230, fn. 5.)

[8] Mother's assertion that *Caden C.* recommended juvenile courts order bonding studies sua sponte misreads the very sentence she quotes from the opinion: "Trial courts should seriously consider, *where requested* and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C., supra,* 11 Cal.5th at p. 633, fn. 4, italics added.)

child's beneficial relationship with a parent." (*Caden C., supra,* 11 Cal.5th at pp. 633–634.)  That cannot be said here.  Mother's love for the children notwithstanding, this record does not allow a conclusion that terminating the children's relationship with mother would be detrimental to the children "even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

## DISPOSITION

The judgment is affirmed.

_____
Kline, J.*

We concur:

_____
Stewart, Acting P.J.

_____
Miller, J.

*In re T.E. et al.*  (A162161)

&#8203;*Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.